Filed 5/13/15  In re Z.G. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re Z.G., a Person Coming Under the Juvenile Court Law. | B259416 (Los Angeles County Super. Ct. No. CK95356) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>N.G.,<br><br>        Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Timothy Saito, Judge.  Affirmed.

Maureen L. Keaney, under appointment by the Court of Appeal, for Defendant and Appellant.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and William D. Thetford, Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \*

N.G. (mother) appeals the juvenile court's order exercising jurisdiction over her infant daughter Z.G. pursuant Welfare and Institutions Code section 300, subdivision (j)[1] based on a prior sustained petition involving Z.G.'s siblings. We find substantial evidence supported the juvenile court's order and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. Petition

Mother has four children: 10-year-old S.W.; eight-year-old K.S.; two-year-old K.W.; and six-month-old Z.G. Only Z.G. is involved in this appeal, although her half-siblings are dependents of the court. The prior sustained allegations involving the half-siblings stated in relevant part: "[Mother] has a history of substance abuse and is a current user of amphetamine, methamphetamine, cocaine and marijuana, which renders the children's mother incapable of providing regular care for the children. The mother used cocaine and marijuana, during her pregnancy with the child [K.W.]. On 8/28/12, the mother had a positive toxicology screen for amphetamine, methamphetamine and cocaine. On 8/28/12 and on prior occasions in 2012, the mother was under the influence of amphetamine, methamphetamine and cocaine, while the children were in the mother's care and supervision. Remedial services failed to resolve the family's problems in that the mother continued to use illicit drugs. The mother's substance abuse endangers the children's physical health and safety and creates a detrimental home environment, placing the children at risk of physical harm and damage."[2] As part of the March 19, 2013 disposition of the siblings' case, mother was given monitored visitation and ordered to participate in individual counseling, alcohol and drug counseling, and aftercare, and to submit to random drug testing.

---

[1] All statutory citations are to the Welfare and Institutions Code unless otherwise noted.

[2] There was also a sustained allegation that mother had engaged in a violent altercation with K.W.'s father, but that is not at issue here.

2

Z.G. was born prematurely in April 2014, and remained in the hospital for over two months on a ventilator, respirator, and supplemental oxygen due to her underdeveloped lungs.[3] On May 12, 2014, DCFS obtained a warrant to remove Z.G. from mother's custody, which DCFS executed by placing a hospital hold on Z.G.

DCFS filed a dependency petition for Z.G. on May 21, 2014, alleging as follows under section 300, subdivisions (b) and (j): "[Mother] has a history of substance abuse, including amphetamine, methamphetamine, cocaine and marijuana, which renders the mother incapable of providing regular care and supervision of the child. The child's siblings . . . are current dependents of the Juvenile Court due to the mother's substance abuse. The mother had failed to regular[ly] participate in a Juvenile Court ordered substance abuse rehabilitation program, after care program, random drug testing and individual counseling. The mother's substance abuse endangers the child's physical health and safety and places the child at risk of physical harm and damage." That day, the juvenile court ordered Z.G. be detained from mother.

2. *Mother's Past Drug Use*

Mother admitted using methamphetamine and cocaine in 2010 and 2011 and marijuana since she was 15 or 16 years old. She claimed all of her use of methamphetamine and cocaine occurred within a six-month period. When she was pregnant with K.W., she believed she had miscarried so she used cocaine at a New Year's Eve party, which caused her to test positive for drugs when he was born. In August 2012—four months after giving birth to K.W. and two months after a team decisionmaking meeting—she went on a "party bus" to Las Vegas and used marijuana, cocaine, and methamphetamine, at which point the siblings were taken away.

---

**3** At the time of Z.G.'s birth, mother tested positive for opiates, although Z.G. tested negative. At the jurisdiction/disposition hearing, however, the Los Angeles County Department of Children and Family Services (DCFS) acknowledged it did not have an expert to testify that mother was using drugs at the time Z.G. was born and declined to pursue that fact as part of the basis for exercising jurisdiction over Z.G.

### 3. *Mother's Compliance with Treatment Programs*

At the time of the jurisdiction/disposition report in this case, mother reported being sober for a year and being in her third treatment program. She first enrolled in services at the New You Center in 2012 for three months and believed she had completed parenting and domestic violence classes. She then enrolled at the Valley Women's Center for one month. DCFS confirmed she had enrolled in substance abuse, parenting, domestic violence, and anger management programs at the New You Center in 2012, where she had obtained certificates in parenting skills, counseling, and anger management, and she had enrolled in substance abuse treatment at the Valley Women's Center for one month. But she had not completed either program, having been discharged for lack of attendance. She had not attended individual counseling, which was an important component of substance abuse treatment and could not be adequately addressed in a 12-step program.

She was most recently enrolled in substance abuse treatment at the Family Counseling Center after Z.G. was born. She had not gone into a program right away because her brother was killed after her children were removed. DCFS reported that, as of July 10, 2014, mother was in compliance with a "Full Drug Program." A July 1, 2014 letter from a counselor at the Family Counseling Center indicated mother was consistently attending a substance abuse education program with twice weekly group sessions and once monthly individual sessions, as well as a 12-step program elsewhere. However, DCFS noted mother was not enrolled in any mental health services at the time. The social worker reported speaking to mother on July 2, 2014, and mother indicated she had an assessment appointment for individual counseling that day. Mother said she would call the social worker after the appointment, but she never did. On July 9, 2014, the social worker eventually spoke with mother, but was unable to determine whether the assessment was done.

Starting in August 2014, mother's attendance at the Family Counseling Center faltered. DCFS reported that on August 6, 2014, mother stated her Medi-Cal funding for her substance abuse program had been terminated, but she would be applying for another

4

type of assistance. As of August 14, 2014, however, her counselor at the Family Counseling Center had not heard from her and she had not attended the program during the first half of August. DCFS reported she was not enrolled in mental health services at the time nor had she complied with a full drug program with aftercare, and DCFS was "strongly opposed" to releasing Z.G. to mother. Between August 27, 2014, and September 10, 2014, mother had attended one group session and one individual session at the Family Counseling Center. As of September 10, 2014, she still was not enrolled in any mental health program and was not compliant with a full drug program.

In a September 2014 letter, the counselor at the Family Counseling Center informed DCFS mother still did not have medical insurance to pay for the substance abuse program. She reported mother was doing well and believed mother could complete the program and followup group sessions if payment was not an issue. She said mother was a "leader" in group sessions and was very good about doing her class assignments but wanted mother to attend more often to learn the tools needed to stay sober. She also believed mother's 12-step program was helping, but she felt mother should find a sponsor to help her stay sober and deal with the challenges of raising her children. She recommended treatment program group sessions three times per week, random drug testing, and ongoing outside 12-step meetings once or twice a week.

On September 11, 2014, mother informed the social worker her drug treatment program was allowing her to attend for free and she was going to the Department of Public Social Services to apply for assistance the next day. The social worker told mother to call after the appointment, but mother never did.

### 3. *Mother's Compliance with Drug Testing*

Between May 10, 2013, and November 18, 2013, mother tested negative six times and failed to show for her tests six times. Between November 18, 2013, and August 16, 2014, she tested negative 14 times and missed four tests. Her drug testing was terminated on September 5, 2014, and a new testing referral was submitted on September 10, 2014. Thereafter, she failed to test on September 15, 2014. She was aware of her missed drug tests, explaining that she missed one because she was in the hospital and missed another

5

because she was visiting Z.G. She claimed to have informed the social worker of both missed tests. She did not explain the reasons for missing the other tests, which DCFS treated as the equivalent of positive tests.

### 4. *Mother's Visitation*

Mother had consistently visited Z.G. while she was in the hospital and mother was permitted to breast feed her. Her visitation with Z.G. thereafter was sporadic. Between June 30, 2014, and August 7, 2014, she visited Z.G. four times and canceled five visits, which included one visit that was canceled because she brought a small child she was babysitting. She visited Z.G. two more times in August 2014, but canceled a third visit, claiming she had to attend a "Multidisciplinary Assessment Team" meeting, which she never attended. She visited Z.G. twice in September. Her visitation with the siblings was also inconsistent, even after the social worker set up a visitation schedule.

### 5. *Jurisdiction/Disposition Hearing*

On October 2, 2014, the juvenile court began a contested combined jurisdiction/disposition hearing for Z.G. and a section 366.22 hearing for the other siblings. At the hearing, the social worker expressed concern about the safety of the children with mother due to mother's unresolved substance abuse issues, her inconsistent program attendance and visitation, and her lack of individual counseling. The social worker also believed there were no precautions that could be taken to protect the children with mother residing in the same household with their caregivers. Likewise, the dependency investigator testified DCFS could not release Z.G. to mother because she had not sufficiently addressed her substance abuse issues.

Mother testified she was currently involved in one-on-one and group substance abuse counseling and attended sessions Mondays and Fridays for the two months. She was unable to attend more frequently due to the loss of her Medi-Cal benefits. She also attended four 12-step meetings a week, had a sponsor, and was on step 10. She acknowledged her drug use harmed her children and took full responsibility for it. She also acknowledged she had not yet completed a substance abuse program, but she had

6

learned through her 12-step program that drug use was not worth losing her children. She learned how to control her anger and to identify her "triggers."

County counsel argued Z.G. was at risk because mother had a history of drug use, failed to complete a drug treatment program, and failed to attend individual counseling. Mother's counsel argued there was no nexus between mother's history of substance abuse and any risk to Z.G., so the court should either dismiss the petition or sustain only the j-1 count.

The court dismissed count b-1 and sustained count j-1 as to Z.G. It declared Z.G. a dependent of the court and ordered reunification services, including a substance abuse program with aftercare, random drug tests, and individual counseling. For the siblings, the court terminated reunification services and set a section 366.26 hearing. In doing so, the court acknowledged mother had made recent progress in her case plan and had shown some insight into her substance abuse issues. It believed she was "very close to adequately addressing these issues, and it may be the subject of a [section] 388 [hearing],"[4] but concluded she had not yet adequately addressed her drug abuse issues, had not maintained consistent visitation, and had not followed through with individual counseling. It viewed her as in the process of learning how to deal with the drug abuse issues, which was why consistent program attendance was important. It allowed mother to have one unmonitored visit a week with the children, with all other visits monitored.

Mother timely appealed the findings as to Z.G. only.

## DISCUSSION

DCFS has the burden of proving by a preponderance of the evidence that the children are dependents of the court under section 300. (*In re I.J.* (2013) 56 Cal.4th 766, 773 (*I.J.*).) "'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted

---

**4** Section 388 generally permits a parent to petition the court to change, modify, or set aside any order or terminate jurisdiction of the court based on a change of circumstances or new evidence. (§ 388, subd. (a).)

7

or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that the issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.] "'[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find [that the order is appropriate].'"'"'" (*Ibid.*)

Subdivision (j) of section 300 allows a juvenile court to exercise jurisdiction over a child if "[t]he child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions." The juvenile court must make two findings pursuant to section 300, subdivision (j): "(1) the child's sibling has been abused or neglected as defined in specified other subdivisions and (2) there is a substantial risk that the child will be abused or neglected as defined in those subdivisions." (*I.J., supra*, 56 Cal.4th at p. 774.) Mother does not dispute the first finding was satisfied by the sustained petition involving Z.G.'s siblings alleging mother's drug use created a substantial risk to them. (*In re Joshua J.* (1995) 39 Cal.App.4th 984, 992.) Thus, the only question is whether substantial evidence supported the juvenile court's finding there was a substantial risk Z.G. would be abused or neglected under one of the relevant subdivisions of section 300.

In considering the risk to a child, section 300, subdivision (j) directs the juvenile to consider a host of factors, including "the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the child." "'The broad language of subdivision (j) clearly indicates that the trial court is to consider the

totality of the circumstances of the child and his or her sibling in determining whether the child is at substantial risk of harm, within the meaning of *any* of the subdivisions enumerated in subdivision (j). The provision thus accords the trial court greater latitude to exercise jurisdiction as to a child whose sibling has been found to have been abused than the court would have in the absence of that circumstance.'" (*I.J., supra*, 56 Cal.4th at p. 774.) "'In determining whether the child is in present need of the juvenile court's protection, the court may consider past events.'" (*In re Francisco D.* (2014) 230 Cal.App.4th 73, 81.)

Although we agree with the juvenile court that mother made strides to address the substance abuse issues that led to the removal of the siblings, there was substantial evidence that mother had not yet adequately resolved those issues, creating a substantial risk of physical harm to Z.G. pursuant to section 300, subdivision (b). That provision provides in pertinent part that a minor comes within the jurisdiction of the juvenile court if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or . . . by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse." (§ 300, subd. (b)(1).) This statutory definition consists of three elements: "(1) neglectful conduct by the parent of one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the child, or a 'substantial risk' of such harm or illness." (*In re Ricardo L.* (2003) 109 Cal.App.4th 552, 567 (*Ricardo L.*).)

Mother's past substance abuse was severe and it seriously impaired her judgment with regard to her children. She admitted using methamphetamine and cocaine in 2010 and 2011, and using marijuana since she was 15 or 16 years old. While she was pregnant with K.W., she believed she had miscarried, but instead of seeking medical confirmation of that, she went to a New Year's Eve party and used cocaine. Then, four months after K.W. was born and two months after a team decisionmaking meeting, she went on a "party bus" to Las Vegas and used marijuana, cocaine, and methamphetamine. Mother

9

also failed to comply with the juvenile court's orders in the siblings' case, indicating she had not yet adequately addressed and resolved these issues. She did not attend individual counseling as ordered and she was removed from two substance abuse programs for lack of attendance. She had enrolled in a third program at the Family Counseling Center after Z.G. was born, but by August 2014, she had stopped regularly attending. She missed a total of 11 drug tests, which the juvenile court was entitled to treat as the equivalent of positive tests. (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1217.) As county counsel contended in the juvenile court, some of mother's missed tests occurred around the time her brother was killed, suggesting she may have been timing her missed tests to hide a relapse. While mother attempted to explain two of her missed tests, she gave no explanation for the other nine. Mother's lapses are particularly serious because Z.G. was only six months old at the time of the jurisdiction/disposition hearing and the absence of adequate supervision and care for a child of such "'tender years . . . poses an inherent risk to [her] physical health and safety.'" (*Id.* at p. 1216.)

Mother likens this case to *In re David M.* (2005) 134 Cal.App.4th 822 and *Ricardo L.*, but both cases are readily distinguishable. In *David M.*, the court found insufficient evidence to support a section 300, subdivision (j) allegation because the only evidence offered by the agency to substantiate the allegations leading to the sibling's case was the prior sustained petition from four years before the current jurisdiction hearing. While the agency noted the mother failed to complete her reunification plan, it offered no evidence of what services were offered to her or what the circumstances were surrounding her failure to fulfill her plan. (*David M.*, at p. 832.) Similarly, in *Ricardo L.*, the court found insufficient evidence to sustain a section 300, subdivision (j) allegation because there was no evidence of the problems that led to the exercise of jurisdiction over the siblings beyond the petition itself or of the reunification services offered to parents and what services they failed to complete. (*Ricardo L., supra*, 109 Cal.App.4th at pp. 567-568.) Here, in contrast, the siblings' petition was sustained a year and a half before Z.G.'s jurisdiction/disposition hearing, and the juvenile court was presented with evidence of both mother's drug abuse leading to the sustained petition over the siblings

and mother's failures since that time to comply with the juvenile court's orders for treatment.

As the Legislature has declared in the analogous circumstance of assessing whether to return a child to a parent's physical custody, "The failure of the parent or legal guardian to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental." (§ 366.22, subd. (a); see § 300.2 ["The provision of a home environment free from the negative effects of substance abuse is a necessary condition for the safety, protection and physical and emotional well-being of the child. Successful participation in a treatment program for substance abuse may be considered in evaluating the home environment."].) The evidence sufficiently supported the court's determination that mother had not yet resolved her serious substance abuse issues that led to the removal of the siblings, creating a substantial risk of harm to Z.G. and justifying the exercise of jurisdiction pursuant to section 300, subdivision (j).

## DISPOSITION

The jurisdictional order is affirmed.


                                                      FLIER, J.

WE CONCUR:


        BIGELOW, P. J.


        GRIMES, J.


11